# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DETMER/BEAUDRY, Minors.

FOR PUBLICATION
August 22, 2017
9:00 a.m.

No. 336348
Kent Circuit Court
Family Division
LC Nos. 16-052784-NA;
16-052785-NA

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and SWARTZLE, JJ.

SWARTZLE, J.

We consider here whether the special protections provided to Native American parents and children under state law apply when a child is taken from her mother's care and residence and placed in her father's care and residence. Concluding that one of respondent-mother's children (AB) was "removed," we hold that the special protections set forth in the Michigan Indian Family Preservation Act do apply to AB's removal. Because the trial court failed to comply with those protections, we vacate and remand for further proceedings. With respect to the other child at issue in this appeal (KD), we hold that the special protections do not apply because KD was not removed from respondent-mother, but instead voluntarily placed by respondent-mother with KD's nonrespondent-father.

## I. BACKGROUND

AB and KD are minor children, and the two children and respondent-mother are of Native American heritage and are eligible for membership in the Sault Ste. Marie Tribe of Chippewa Indians (the Tribe). In September 2016, the Department of Health and Human Services (DHHS) petitioned the trial court to remove the minor children from respondent-mother's care. The petition noted respondent-mother's extensive history with Children's Protective Services and alleged that inappropriate sexual contact had occurred multiple times among her minor children, including three other children who are not subject to this appeal. At the preliminary hearing, respondent-mother voluntarily placed most of her minor children into the care of the minor children's relatives. KD was voluntarily placed with her nonrespondent-father, but AB remained in respondent-mother's care. The trial court made no findings on whether DHHS made "active efforts" to provide remedial services or whether respondent-mother's continued custody posed a risk-of-harm to the minor children, as the placements at that time were voluntary.

-1-

The trial court assumed jurisdiction over the children in November 2016. At adjudication, the trial court ordered that AB be placed with his nonrespondent-father out of concern for his safety in respondent-mother's home. KD's prior voluntary placement was continued. The trial court expressly declined to make any findings as to active efforts or risk-of-harm, stating that these findings were unnecessary because AB was placed in the home of his nonrespondent-father and, therefore, he was still in the care of a parent. According to the trial court, because AB's father was a nonrespondent, under *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014), AB's father had "every right to go take [his] child and . . . take that child home" and the trial court did not "have any say whatsoever over" AB's placement. The trial court therefore concluded that, because AB was not "out of the home of a parent," it did not need to address active efforts or risk-of-harm.

Several days after the November 2016 hearing, respondent-mother's attorney emailed the trial court (copying the other parties), and notified the court that its written order of adjudication incorrectly identified respondent-mother as voluntarily placing AB with his nonrespondent-father. The trial court issued a corrected adjudication order shortly thereafter. The email did not make any specific mention of KD, though it did indicate that the "other children" had been "voluntarily placed." Moreover, the referee and trial court held subsequent hearings in February 2017, and during both hearings, KD's placement with her father was characterized as voluntary, and neither respondent-mother's attorney nor anyone else objected to that characterization.

Respondent-mother appealed as of right, arguing that the placement of AB and KD violated protections set forth in the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.* Because no stay had been entered, the case progressed below. After the parties completed appellate briefing, this Court set the date of oral argument for August 8, 2017. Prior to oral argument, the trial court held a progress review hearing on July 27, 2017.

During the hearing, the trial court noted that both AB and KD had been returned to respondent-mother's care and residence in mid-June 2017. The trial court commended respondent-mother on the "fantastic job" that she had done in turning her life around, pursuing education, engaging in the available programming, and similar positive acts. The trial court recognized respondent-mother's "excellent responsiveness," but the court did strike a cautionary note that with respect to this family, "we have been back and forth, and back and forth, and back and forth." The trial court closed the case, but before doing so, it stated that the question of removal is an "incredibly important" one and expressed its hope that this Court would address it on appeal.

This Court heard oral argument on August 8, 2017. In response to questions about whether this appeal was moot, counsel for respondent-mother, the Tribe, and petitioner all agreed that the appeal was moot now that the case below had been closed. But, all counsel further asked this Court to reach the merits of the appeal regardless of mootness because the case involved an issue of public significance that is likely to recur, yet evade appellate review. See *In re Midland Publishing Co, Inc*, 420 Mich 148, 152 n 2; 362 NW2d 580 (1984).

## II. ANALYSIS

A.    The Case Is Moot, But the Exception Against Deciding Moot Cases Applies

      1.    Judicial Authority and Mootness

Courts of this state derive their authority from Article VI of the Constitution of the State of Michigan of 1963. An "essential element" of our courts' judicial authority is that the courts do "not reach moot questions or declare rules of law that have no practical legal effect in a case." *City of Warren v City of Detroit*, 471 Mich 941, 941-942; 690 NW2d 94 (2004) (Markman, J, concurring). One of "the most critical" aspects of judicial authority, as opposed to legislative or executive authority, is the requirement that there be a "real" controversy between the parties, as opposed to a "hypothetical" one. *Id.* at 942. Thus, before we can reach the merits of this appeal, we must first consider whether it has become moot.

Generally speaking, a case becomes moot when an event occurs that makes it impossible for a reviewing court to grant relief. *Contesti v Attorney General*, 164 Mich App 271, 278; 416 NW2d 410 (1987). Stated differently, "a case is moot when it presents nothing but abstract questions of law which do not rest upon existing facts or rights." *People v Richmond*, 486 Mich 29, 35; 782 NW2d 187 (2010) (internal citations and quotation marks omitted). "Where a court's adverse judgment may have collateral legal consequences for a [party], the issue is not necessarily moot." *Mead v Batchlor*, 435 Mich 480, 486; 460 NW2d 493 (1990), abrogated on other grounds by *Turner v Rogers*, 564 US 431; 131 S Ct 2507 (2011). Where no such collateral legal consequences exist, and there is no possible relief that a court could provide, the case is moot and should ordinarily be dismissed without reaching the underlying merits. *Richmond*, 486 Mich at 35.

There is, however, a well-recognized exception to the dismissal of a moot case. Where a case presents an issue of public significance, and disputes involving the issue are likely to recur, yet evade judicial review, courts have held that it is appropriate to reach the merits of the issue even when the case is otherwise moot. *Id.* at 37; *In re Midland Publishing*, 420 Mich at 152 n 2.

      2.    The Case Is Moot

We agree with the parties' counsel that this case is now moot. Both AB and KD have been returned to the care and residence of respondent-mother, and the trial court has ended its jurisdiction and ordered the case to be closed. None of parties' counsel could identify a collateral legal consequence faced by respondent-mother, AB, or KD as a result of the temporary placement of the two children, and we are likewise not aware of any.

      3.    Public Significance, Likely to Recur, and Evading Judicial Review

Recognizing that the case is moot, we turn to whether the exception applies. The issue on appeal—whether a Native American child has been "removed" from a parent—has paramount public significance. As our Supreme Court explained in *In re Sanders*, 495 Mich at 531, fundamental due process includes "the right of parents to make decisions concerning the care,

custody, and control of their children." This right "is an expression of the importance of the familial relationship and stems from the emotional attachments that derive from the intimacy of daily association between child and parent." *Id.* at 532 (internal quotation marks omitted). This significant liberty interest of parents "in the companionship, care, custody, and management of their children," *id.*, is further reflected and magnified in efforts by federal and state governments to maintain the integrity of Native American families and tribes, see, e.g., 25 USC 1901; MCL 712B.5(a); see also *In re Morris*, 491 Mich 81, 98; 815 NW2d 62 (2012) (noting that the federal counterpart to Michigan's MIFPA evidenced "a profound recognition of the separate and distinct rights of Indian tribes to their children, the most critical resource necessary to preserve not only tribal culture, but the tribes themselves").

Moreover, disputes involving the issue are likely to recur. One of the problems identified by Congress and our Legislature prior to enactment of the federal Indian Child Welfare Act and Michigan's MIFPA was that Native American children were being removed from their families and tribes at alarmingly high rates. See *In re Morris*, 491 Mich at 97-98; 25 USC 1901(4). More broadly, it is a common occurrence throughout the trial courts of this state that children sometimes have to be removed from their parents, and our Legislature and DHHS have created an extensive legal framework for doing so in a lawful manner. See, e.g., MCL 712A.1 et al.

Finally, on the matter of evading judicial review, the present case illustrates well the quandary faced by a parent who wishes to challenge on appeal the temporary removal of her child. Both AB and KD were placed outside the care and residence of respondent-mother, but this was not part of a final order of judgment, but rather as part of the trial court's ongoing monitoring of respondent-mother's progress with her parental programming, housing, education, etc. The trial court held periodic progress review hearings while this case was on appeal, and during the last of these hearings, the court determined that respondent-mother had made such significant progress that all of her children, including AB and KD, would be returned to her. While it is laudable that the trial court and parties worked so diligently to bring this case to a positive resolution, this diligence does not alter the fact that AB and KD were placed under the care and residence of someone other than respondent-mother. Given the typical pace of appellate review, it is unlikely that claims about temporary placements similar to those of AB and KD will achieve final resolution on appeal before the trial court either reverses or materially modifies the placement, or terminates the parent's rights altogether.

In sum, we agree with the parties' counsel that this matter is moot, but also that the exception applies—this case involves an issue of public significance, it is likely to recur, and it is likely to evade appellate review. Accordingly, we will consider the merits of this appeal and decide whether AB and KD were "removed" from respondent-mother.

B.    Statutory Protection of Native American Families

Respondent-mother, AB, and KD are eligible for membership in the Tribe, and both AB and KD are Native American children. Given this, the procedural and substantive provisions of MIFPA apply to certain proceedings regarding the minor children. MCL 712B.3(k); *In re England*, 314 Mich App 245, 250; 887 NW2d 10 (2016). Relying on language in MCL 712B.15(2), respondent-mother argues that the trial court erred when it purportedly "removed" AB and KD without first making any findings as to active efforts or risk-of-harm. DHHS

responds that the trial court did not "remove" either child and, accordingly, the provisions of MCL 712B.15(2) do not apply. Thus, to resolve this matter, we need to construe the meaning of "removed" under MIFPA.

We review de novo issues involving the interpretation and application of MIFPA. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 462-463; 861 NW2d 303 (2014). When interpreting a statute, the overriding goal is to give effect to the intent of the Legislature. *In re Spears*, 309 Mich App 658, 671; 872 NW2d 852 (2015). To determine legislative intent, we look first to the language of the statute itself. *Id.* "When construing statutory language, we must read the statute as a whole and in its grammatical context, giving each and every word its plain and ordinary meaning unless otherwise defined." *Book-Gilbert v Greenleaf*, 302 Mich App 538, 541; 840 NW2d 743 (2013) (internal quotation marks and citation omitted). When the terms of a statute are clear and unambiguous, this Court must enforce the statute as written. *In re Spears*, 309 Mich App at 671.

In 2012, Michigan enacted MIFPA for the purpose of protecting "the best interests of Indian children and promot[ing] the stability and security of Indian tribes and families." MCL 712B.5(a). MIFPA's procedural and substantive measures are "designed to prevent the voluntary or involuntary out-of-home care placement of Indian children" and, when such a placement does occur, to place Native American children in homes that reflect the values of their tribe. MCL 712B.5(b).

MCL 712B.15 provides specific procedures a trial court must follow when "an Indian child is the subject of a child protective proceeding under [MCL 712A.2(b)]." MCL 712B.15(1). MCL 712A.2(b) provides the means by which a trial court may assume jurisdiction over a minor child, including when a parent fails to provide proper custody and care to the minor child, the home environment is an unfit place for the minor child to live, or the minor child is in danger of substantial physical or psychological harm.

When a Native American child is the subject of a child-protective proceeding, MIFPA provides, among other things, the following protections:

> An Indian child may be removed from a parent or Indian custodian, placed into a foster care placement, or, for an Indian child already taken into protective custody, remain removed from a parent or Indian custodian pending further proceedings, only upon clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. [MCL 712B.15(2).]

By the statute's own terms, the trial court is not subject to these requirements when the Native American child is not "removed" from the parental home, "placed into . . . foster care," or otherwise in "protective custody." *Id.*; *In re England*, 314 Mich App at 264-265.

-5-

C.	The Trial Court Erred With Respect to AB

1.	*In re Sanders* Is Not Dispositive

Before reaching the dispositive issue with respect to AB, we first note that the trial court's reliance on *In re Sanders* was misplaced. The trial court appears to have believed that because AB was placed with his father—who was not a respondent to the proceedings and no efforts had been made to petition his involvement—this placement meant *both* that the trial court could not make a ruling that would infringe AB's nonrespondent-father's parental rights *and also* that the provisions of MIFPA did not apply. As to the first point, the trial court was certainly correct that it did not have authority to infringe AB's nonrespondent-father's parental rights. As our Supreme Court explained in *In re Sanders*, "We accordingly hold that due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." *In re Sanders*, 495 Mich at 422.

Yet, as to the second point, the trial court erred. Neither the holding nor the reasoning of *In re Sanders* negates or otherwise undermines the statutory requirements a trial court must follow before removing a Native American child from an adjudicated parent. Here, DHHS had filed a petition with respect to respondent-mother; respondent-mother and AB were properly within the trial court's jurisdiction; and the two met the qualifying conditions of MIFPA. Given this, the trial court should have considered whether moving AB from respondent-mother's care and residence to his nonrespondent-father's care and residence triggered MIFPA's provisions. *In re Sanders* is a shield to protect the rights of a nonadjudicated parent, not a sword to pierce the rights of an adjudicated parent or child.

2.	AB Was "Removed" from Respondent-Mother

Under MIFPA, a child-protective proceeding involving a Native American family must generally comply with the provisions of MCL 712B.15. MCL 712B.15(1). With that said, the requirements of MCL 712B.15(2) that active efforts and a risk-of-harm assessment be made are triggered only when a Native American child is "removed" from a parent, placed in foster care, or otherwise put in protective custody. Because there is no dispute that AB was not in foster care or protective custody, we focus our inquiry on whether he was "removed" from a parent.

MIFPA does not define "removed." In the absence of a statutory definition, we may turn to dictionaries in common usage for guidance. See *In re Lang*, 236 Mich App 129, 136; 600 NW2d 646 (1999). *Black's Law Dictionary* defines "removal" as the "transfer or moving of a person or thing from one location, position, or residence to another." *Black's Law Dictionary* (10th ed). For its part, *Merriam-Webster* has several definitions of "remove"; ignoring the ones dealing with transferring a legal proceeding from state court to federal court or dismissing an officeholder from office, the remaining definitions involve the physical movement of an object, the most apt definition being the following: "to change the location, position, station, or residence of." *Merriam-Webster's Collegiate Dictionary* (11th ed).

These definitions focusing on physical transfer or movement are consistent with how "removal" and "removed" are used in MIFPA and other child-protection provisions in Michigan

-6-

law. For example, the Legislature explained that the framework of MIFPA is "designed to prevent the voluntary or involuntary *out-of-home* care placement of Indian children." MCL 712B.5(b) (emphasis added). As another example, in addition to when a child is removed from a parent, the placement of a child in foster-care or protective custody can also trigger the active efforts and risk-of-harm protections, and each of these placements involves the physical transfer or movement of a child. Under the traditional canon of construction that a term is known by the company it keeps, we should understand "removed" to have a similar physical transfer/movement component. See *GC Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421-422; 662 NW2d 710 (2003).

Indeed, this reading is consistent with the Legislature's use of the term "removed" in other sections of the Probate Code involving minors. Compare, for example, the different timelines for a dispositional review in a child-protective proceeding when a child "remains in his or her home" versus when a child is "removed from his or her home." MCL 712A.19(2),(3). Other provisions of the Probate Code reinforce this understanding of "removed." See, e.g., MCL 712A.19a; MCL 712A.19c. As MIFPA and the other child-protection provisions of the Probate Code relate to the same or similar subject (protection of children and families), we can read the term "removed" in MCL 712B.15(2) consistent with the term's similar use in the other provisions. *Walters v Leech*, 279 Mich App 707, 709-710; 761 NW2d 143 (2008).

Thus, we understand "removed" in MCL 719B.15(2) to mean the instance when a court orders that a child be physically transferred or moved from the care and residence of a parent or custodian to the care and residence of some other person or institution. Based on this understanding, it becomes clear that the trial court erred with respect to AB. Over respondent-mother's objection, the trial court ordered that AB be physically placed with his nonrespondent-father. AB had previously resided with respondent-mother and spent every other weekend with his nonrespondent father. The trial court's order moved AB's residence to his nonrespondent-father's home and conditioned respondent-mother's visitation on the discretion of DHHS. Under our reading of MCL 712B.15(2), the trial court "removed" AB from respondent-mother.

DHHS responds that this Court's decision in *In re England*, 314 Mich App at 264-265, demonstrates that AB was not "removed" from respondent-mother because AB was not transferred or moved from both of his parents, but instead remained placed with one of his parents. *In re England* is not, however, applicable here. The Native American child in *In re England* did not move residences. See *id.* The child had physically resided with his mother and physically remained with his mother throughout the proceedings. See *id.* In contrast, AB did not remain in respondent-mother's physical care but was required to move residences. In other words, although AB was placed with a parent, this does not negate application of the statute's provisions, which are triggered when a Native American child is "removed from a parent" and which occurred in this case when AB was physically removed from respondent-mother and placed in his nonrespondent-father's care and residence.[1]

---

[1] We note that the proceedings below did not involve a custody battle between two parents. Other provisions of MIFPA apply to custody battles. See, e.g., MCL 712B.5; MCL 712B.7.

Because AB was removed from a parent, the trial court was required under MIFPA to make findings on whether active efforts were made to provide remedial services, whether those efforts were successful, and whether respondent-mother's continued custody of AB posed a risk of emotional or physical harm to the child. MCL 712B.15(2). The trial court was similarly required to hear testimony of a qualified expert witness concerning these matters. MCL 712B.15(2). The trial court made no such findings and heard no such testimony, and this was reversible error.

D.     The Trial Court Did Not Err With Respect to KD

Turning to KD, the placement with her nonrespondent-father was not court ordered, nor was it ordered by law enforcement on an emergency basis. Rather, the record shows that respondent-mother voluntarily placed KD with her nonrespondent-father. There is nothing in the record to suggest that either the court or the parties understood the voluntary placement to be a permanent relinquishment of any of respondent-mother's parental rights, nor is there anything in the record to suggest that respondent-mother was somehow precluded from revoking the voluntary placement and requiring more formal proceedings regarding KD. This is quite different than being "removed"—in fact, this is an example of respondent-mother exercising her fundamental right "to make decisions concerning the care, custody and control" of her children. *In re Sanders*, 495 Mich at 409. See also *Meyer v Nebraska*, 262 US 390, 399-40l; 43 S Ct 625; 67 L Ed 1042 (1923).

Our child protection laws, including MIFPA, constrain the state from interfering in the parent's fundamental right to parent unless and until sufficient proof has been presented that the child's moral, emotional, mental, or physical welfare needs protection by the state. See *In re Sanders*, 495 Mich at 409-410; see also *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 21 L Ed 2d 551 (1972). Although the Legislature has extended some provisions of MIFPA to certain proceedings in which a Native American parent voluntarily gives up her fundamental rights, see, e.g., MCL 712B.13 (requiring that certain requirements be met when a parent consents to a guardianship or voluntarily relinquishes his or her parental rights), our Legislature has not provided these protections when a Native American parent retains in toto her fundamental right to direct the child's care. And, suffice it to say that it is outside our constitutional authority to extend MIFPA on our own.

III. CONCLUSION

Respondent-mother and her children, AB and KD, are eligible for the protections afforded to Native American families under MIFPA. The trial court removed AB from the care and residence of respondent-mother, and this removal triggered the statutory protections set forth in MCL 712B.15(2). The trial court erred by not affording respondent-mother and AB these protections and, accordingly, we vacate the trial court's order of adjudication with respect to AB and remand for further proceedings consistent with this opinion.

With respect to KD, the trial court did not remove her from the care and residence of respondent-mother, as explained above. We affirm with respect to KD's voluntary placement with her nonrespondent-father.

We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause